## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BECKY BELT et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 05-4132-JPG |
| MARION COMMUNITY UNIT SCHOOL, DISTRICT NO. 2 | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter is before the Court on Defendant Marion Community Unit School District No. 2's (the "District") motion to dismiss Counts X, XI and XII of Plaintiffs' first amended complaint. (Doc. 24). The District submitted a memorandum of law in support of its motion (Doc. 25), to which plaintiff Jennifer Lincoln ("Lincoln) has responded (Doc. 31) and the District has replied (Doc. 35). For the following reasons, the District's motion to dismiss will be **DENIED**.

## BACKGROUND

Lincoln, like her fellow plaintiffs, is a teacher at Washington School, an elementary school in the District. She has worked for the District for 14 years (at least 10 years at Washington) and is a tenured teacher under Illinois law. *See* 105 ILCS § 5/24-11. The events giving rise to the instant litigation began sometime in 2003 or 2004, when the District's Superintendent, Wade Hudgens, made it known that he wanted to implement a new system for organizing the District's elementary schools. Traditionally, the District has had geographically-based elementary schools, that is, schools catering to students of several grades drawn from specific geographical areas. Hudgens wanted to do away way the old system in favor of attendance centers, where, for example,

-1-

all first and second grade students in the District would attend one school that housed only those grades. Lincoln, like her fellow plaintiffs, believed that this plan would hurt the District's students and relayed her concerns to a member of the District's Board of Education (the "Board"), Dick Baggett. Pursuant to Baggett's request, Lincoln polled the other teachers at her school and informed her principal, Debra Runion ("Runion"), that she intended to present the results of her poll to the Board at its meeting in October 2003. Runion counseled her against such action and Lincoln heeded her warning. After another conversation, Lincoln was similarly dissuaded from presenting her findings in November; however, she eventually presented the results of her poll at the December meeting. After she presented this information, Hudgens' attitude toward her soured and he rarely, if ever, spoke to her after that time.

Lincoln and her fellow plaintiffs participated in a number of meetings and presentations regarding the District's proposed plan. At these meetings, Lincoln and the other plaintiffs expressed concern over the proposed attendance centers, Hudgens' plan to test first grade students at the beginning of the year rather than during the fourth quarter and his plans to change the elementary school reading program. Lincoln also voiced her opposition to the attendance centers and the reading programs in several interviews with local newspapers. On April 7, 2005, Lincoln's husband wrote a letter to the editor in a local newspaper expressing his concerns with Hudgens' and the Boards' fiscal policies and the attendance center plan. On April 13, 2005, Lincoln's husband's employer, Marion Ford, received an anonymous letter stating that its author and others of like mind would no longer patronize the business so long as Mr. Lincoln remained an employee. Marion Ford's owner, Don Fisher, called Hudgens to inquire as to whether he knew the identity of the letter's author. Though he stated that he did not know the letter's author, Hudgens indicated that

neither he nor the members of the Board wanted anything to do with Marion Ford so long as Mr. Lincoln remained in its employ. Lincoln allegedly suffered retaliation more directly in the form of lower performance evaluations from Runion. Specifically, Runion evaluated Lincoln's performance in the categories of communication, attitude and cooperation satisfactory. In all of these categories Lincoln had previously received "excellent" marks – apparently one grade above the satisfactory level. When Lincoln questioned her about these departures, Runion told her that "she was the martyr of the school and that she had brought everyone down on the administration . . . that she should have handled the attendance center issue differently." (Doc. 22 at ¶ 122). Lincoln alleges that these marks were in retaliation for her speech on the matters previously discussed. For these reasons, Lincoln claims the District violated her rights under the First and Fourteenth Amendments to the United States Constitution (Count X), Article 1, Section 4 of the Illinois Constitution (Count XI) and the Illinois Local Government Employees Political Rights Act, 50ILCS 135/1 *et seq.* (Count XII).

      The District's motion to dismiss only relates to plaintiff Lincoln's claims in the complaint, Counts X, XI and XII. The District claims she has failed to state a claim upon which relief can be granted on all of these counts because receiving lower marks is not a sufficient adverse employment action to support a claim of retaliation under the First Amendment and the Illinois statutes serving as the basis for her part of the complaint. The District also claims Lincoln lacks standing to challenge the alleged retaliatory actions taken against her husband.

## ANALYSIS

      When reviewing a Rule 12(b)(6) motion to dismiss, the Court accepts all allegations as true and draws all reasonable inferences in favor of the plaintiff. *Brown v. Budz*, 398 F.3d 904, 908 (7th

Cir. 2005); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). The Court should not grant a motion to dismiss unless it appears beyond doubt that the plaintiff cannot prove his claim under any set of facts consistent with the complaint. *Brown*, 398 F.3d at 908-09; *Holman*, 211 F.3d at 405. "[I]f it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 909 (internal quotations omitted).

Generally, courts will not grant a motion to dismiss merely because the complaint is vague or lacking in detail so long as it pleads "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002); *see Brown*, 398 F.3d at 908; *Strauss v. City of Chicago*, 760 F.2d 765 (7th Cir. 1985). A complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998); *American Nurses' Ass'n v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986). Nor must it allege all, or any, of the facts logically entailed by the claim. *Higgs,* 286 F.3d at 439; *Bennett*, 153 F.3d at 518; *American Nurses'*, 783 F.2d at 727. Nonetheless, the complaint must provide a short and plain statement of the claim sufficient to fairly put the defendant on notice of the claim and its basis. *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *Brown*, 398 F.3d at 908; *see also* Fed. R. Civ. P. 8(a).

Stated broadly, the two issues presented by this motion are whether Lincoln's receipt of lower marks on her employment evaluation can serve as a sufficient act of retaliation under any of the provisions cited in her complaint and whether she has standing to bring claims resulting from alleged actions taken against her husband. The resolution of the second issue necessarily plays into

the first, as will become clear below.

In order to state a First Amendment claim for retaliation, a plaintiff need only allege that she engaged in activity protected by the First Amendment and that the defendant's actions were motivated by that protected activity. *See Higgs*, 286 F.3d at 439; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If a plaintiff makes such allegations, her complaint will withstand dismissal for failure to state a claim unless she pleads too much, that is, facts showing that she cannot prevail in her lawsuit. *See, e.g., Jefferson v. Ambroz*, 90 F.3d 1291, 1296 (7th Cir. 1996). To prevail on her First Amendment retaliation claim, Lincoln must show that her speech was constitutionally protected and that the speech was a substantial or motivating factor in the District's retaliatory action. *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). For purposes of this motion, the District does not contest that Lincoln engaged in protected speech or that the District acted in response to her speech. The only issue before the Court here is whether the alleged actions taken here are sufficient to support a claim upon which relief can be granted.

Lincoln must show that she "suffered an adverse employment action motivated by the exercise of [her] right to free speech." *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 191 (7th Cir. 1995) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The retaliatory action "must be sufficiently adverse to present an actual or potential danger that the speech of employees will be chilled." *Id*. (citing *Rutan v. Republican Party of Illinois,* 497 U.S. 62 (1990)). These actions need not be "monstrous"; they need only create the potential to chill speech. *Id*. *DeGuiseppe* is a reasonable place to start the Court's discussion. In that case, an officer of the Bellwood, Illinois police department claimed the village and its police chief retaliated against him in violation of the First Amendment after he unsuccessfully opposed the chief's ascension to that possession. *Id*. at

189. Specifically, the officer claimed retaliation in defendants' refusal to grant him light duty status. *Id*. The Court found no sufficient retaliation because the officer failed to show that defendants had taken some action "with materially adverse consequences to him." *Id*. at 192. The Court held that a material change in the circumstances of employment "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*. (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)). Put another way, the action must be "adverse in the sense that the employee is made worse off by it." *Id*. That the chief required the officer to obtain additional medical advice regarding his request for light duty and that after relating to the chief the doctors' suggestion that he no longer remain a police officer, suggesting the officer take a pension, was insufficient to meet this standard. *Id*. Finding that he did not suffer any loss – "not a penny" – the Court found that he did not suffer an adverse employment action. *Id*. Though the circumstances in *DeGuiseppe* are quite different from the circumstances here, the Court's analysis there serves to define the initial point of contention between the parties.

In her response to the District's motion to dismiss, Lincoln takes issue with its assertion, under *DeGuiseppe* and similar cases, that a plaintiff need show an "adverse employment action" to state a claim for retaliation in violation of the First Amendment. Citing *Spiegla v. Hull*, among other cases, Lincoln asserts that she need not show an "adverse employment action" as that requirement has been defined in the cases brought under Title VII and the other antidiscrimination statutes. Rather, she insists that "any deprivation . . . that is likely to deter the exercise of free speech . . . is actionable." *Spiegla*, 371 F.3d at 928 (quoting *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000)). Though the disagreement on this relatively fine point might seem like a trivial exercise in semantics, it is important because the Seventh Circuit has said that a retaliatory action under the

First Amendment need not even relate to employment. In *Powers v. Summers*, the Seventh Circuit sought to clarify its holding in *DeGuiseppe*. 226 F.3d at 820. In *Powers*, the Court held that there is no requirement under § 1983 and the constitutional doctrines it enforces that alleged actions taken in retaliation for free speech "alter[] the terms or conditions of . . . employment." 226 F.3d at 820. One can state a claim for retaliation under the First Amendment based on actions that do not even relate to employment. *Id*. All that is required is a "deprivation under color of law that is likely to deter the exercise of free speech . . . even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday." *Id*. (citing *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982)). Explaining its holding in *DeGuiseppe*, the Court said its reasoning there was meant to reflect that an employee must show that the activity complained of was sufficient to deter the exercise of his free speech rights. *Id*. at 820-21 (unwilling to conclude that the denial of a few hundred dollar raise was unlikely to deter the exercise of free speech).

The Seventh Circuit has addressed negative employment evaluations in the Title VII context a number of times. The District believes the Court should conduct an analysis similar to that conducted in Title VII cases, citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002), among other cases. In *Hilt-Dyson*, the Seventh Circuit found, like it has in a number of Title VII cases, that "negative evaluations, standing alone, do not constitute adverse employment actions." *Id*.; *see also Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (same); *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999) (same). It is clear, therefore, that negative evaluations are insufficient under Title VII. However, the policies which underlie the antidiscrimination statutes are not the same as those that are implicated under the First Amendment. As the Court stated in *Bart v. Telford*, though the effect of harassment and ridicule "on freedom of

speech may be small . . . since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." 677 F.2d 622, 625 (7th Cir. 1982) (finding that it was a question of fact whether defendants' campaign of petty harassments "reached the threshold of actionability under § 1983"); *see also Lifton*, 416 F.3d at 576 (assuming for purposes of decision that a recommendation of fifteen-day suspension, though not served, could constitute an adverse action sufficient to give rise to a retaliation claim because the injury in these cases need not be great). The question remains whether a lower evaluation is sufficient for First Amendment retaliation. More precisely, to dispose of this motion, the Court must determine whether a lower, but not negative, evaluation combined with threats against a spouse (to the extent a plaintiff can complain of them) are sufficient in this context. Thus, before proceeding with the inquiry on the first issue, the Court must necessarily decide the second, whether Lincoln has standing to sue for the actions taken against her husband.

In the complaint, Lincoln alleges that "Hudgens threatened Mr. Lincoln's employment at Marion Ford in retaliation for Ms. Lincoln's speech on matters of public concern and/or public policy." (Doc. 22 at ¶ 124). Lincoln alleges that this threat and the lower marks "chill[ed her] and similarly situated persons' protected speech activities." (*Id*. at ¶ 125). Thus, it is clear that she alleges that Hudgens retaliated against her by threatening her husband's job. The Court believes that actions such as this – threatening the job of a spouse, thus threatening the couple's livelihood – could certainly have a chilling effect on a reasonable person's speech. However, the question remains whether Lincoln has standing to assert this action as a basis for her retaliation claim under the First Amendment. In support of its argument on the standing issue, the District directs the Court to a footnote in the Seventh Circuit's third footnote in *Lifton*. *Lifton*, 416 F.3d at 576 n.3. After,

reviewing that footnote, the Court does not see how it supports the District's position. *See id.* The other case cited by the District on this point is *Toronyi v. Barrington Cmty. Unit Sch. Dist. 220*, No. 03 C 3949, 2005 WL 388568, at *11 (N.D. Ill. Feb. 10, 2005). There, plaintiffs, Mr. and Mrs. Toronyi, sued the Barrington School District and others for retaliatory discharge claiming that the district caused her husband to be terminated from his job as a firefighter for Mrs. Toronyi's complaints about certain dismissal policies at her son's school. *Id*. at *1. Mrs. Toronyi purported to bring a First Amendment retaliation claim on her own behalf for her husband's termination. *Id*. at *4. The district court indicated that it did not believe that Mrs. Toronyi had a protected interest in her husband's employment. *Id*. at 6. However, this statement appears to have been dicta because it went on to hold that because plaintiffs did not allege that Mr. Toronyi's "termination was caused by Mrs. Toronyi's actions, it cannot serve as the basis for a First Amendment retaliation claim on her behalf." *Id*. The instant case is distinguishable from *Toronyi*. Here, Lincoln argues that Hudgens and the Board endangered her husband's job in retaliation for her outspoken stance on the issues discussed above. Lincoln's allegations are different than those in *Toronyi* because she claims the threats to her husband's job were in retaliation for her speech and caused her to stop speaking on issues the parties agree (at least in this motion) were of public concern. Thus, she has made a claim that the actions against her husband were to get at her. In the Court's view, contrary to the District's, the fact that her husband has a suit pending in state court because of these activities is immaterial. As a matter of common sense, the loss of a spouse's job would significantly affect the financial situation of all but the most affluent of couples, at least in the short term. Thus, if such threats were actually made, it is not unreasonable to believe that the fear over the loss of her husband's job would cause her to stop her campaign against the proposed changes. The Seventh

Circuit has explained the general nature of standing as follows:

> A plaintiff has standing to sue – that is, he can invoke the jurisdiction of the court – if he is tangibly, materially, injured by the conduct of the defendant that he claims is unlawful and if the relief he seeks would redress the injury in whole or in part and thus confer a material benefit on him.

*Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 909 (7th Cir. 2003); *see also Lugan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Here, Lincoln claims Hudgens committed an unlawful act – threatening her husband's job in retaliation for her exercise of her First Amendment rights – which injured her, that is, forced her to stop exercising her right to speak against programs she felt improper. She seeks an injunction against future conduct of this sort and seeks damages for the distress she suffered as a result of these actions. Thus, in the absence of any more specific claim by the District, the Court cannot agree with its contention that Lincoln does not have standing to sue over the threats against her husband. Whether such actions were taken under color of state law is another matter – but irrelevant here, because the parties have not addressed this issue in their briefs. Thus, the Court is unwilling to say that being threatened with the prospect of a spouse's lost job could not have a chilling effect on protected speech.

In any event, Lincoln claims that lowered employment evaluations are sufficient to substantiate actionable retaliation under the First Amendment. This contention finds some support in the case law of this circuit. In *Hulbert v. Wilhelm*, 120 F.3d 648, 654-55 (7th Cir. 1997), the Seventh Circuit implicitly recognized that lower than normal job evaluations, when combined with other actions, are sufficient to state a claim for First Amendment retaliation. The Court held similarly in *Knapp v. Whitaker*, 757 F.2d 827, 843 (7th Cir. 1985) (implicitly finding that negative evaluations taken together with the denial of a personal leave day were sufficient acts to state a claim for retaliation under the First Amendment). In its reply, the District attempts to distinguish

*Hulbert and Knapp* from the case at bar. It *Hulbert*, over the course of the events giving rise to the complaint, Hulbert's performance evaluations went from consistent 1s and 2s – corresponding to "distinguished" and "commendable" – to a review where he "received no 1's at all, a few 2's, and many grades between 2 and 3" and finally a review where he received more grades between 3 and 4. *Hulbert*, 120 F.3d at 650, 652. Further, he was denied promotions and received a less than expected cost of living adjustments to his pay. *Id*. at 652. The District is correct that the evaluations received by Hulbert were somewhat lower than Lincoln's here. Its arguments under *Knapp* are of an equivalent degree of persuasiveness. The District's argument is relatively persuasive on this point, but insufficient to win the day. Though the changes in the evaluations received in those cases were more substantial, the cases still support the notion that lowered marks, when combined with other acts of intimidation, are sufficient to state a claim for First Amendment retaliation. Thus, the Court refuses to accept the distinction the District strenuously urges upon the Court.

If the Court were inclined to agree with Lincoln's position, the District believes it should refrain from ruling in her favor with respect to this motion because such an order would "open the floodgates for a litany of baseless First Amendment retaliation claims against school districts, with claims based on incidents as flimsy as perceived dirty looks in the local coffee shop." There are a couple of problems with this argument. In the first place, the Court sees no great difference in bad looks at the coffee shop and making fun of an employee for bringing a birthday cake to the office. *See Summers*, 226 F.3d at 820; *Bart*, 677 F.2d at 625. In any event, the retaliatory actions here, at least the evaluation, were motivated by her conduct as – when taken as true and viewed in Lincoln's favor – is shown by Runion's statements. The District is making what has been termed a "Cost-

Lowering Slippery Slope" argument. Eugene Volokh, *The Mechanisms of the Slippery Slope*, 116 HARV. L. REV. 1026 (2003) (condensed version), *available at*, www.law.ucla.edu/volokh/slipperyshorter.pdf.  A working definition of the slippery slope is "one that covers all situations where decision A, which [one] might find appealing, ends up materially increasing the probability that others will bring about decision B, which [one] oppose[s]." *Id*. at 3.  Thus, to repeat the District's claim in terms of Professor Volokh's framework, accepting Lincoln's position, A, would increase the probability of, or make other courts more likely to accept a claim based on "incidents as flimsy as perceived dirty looks in the local coffee shop" – B.  The Court does not believe the concerns expressed by the District are as pressing as it would have the Court believe.  Position A is materially different from provision B, insofar as Runion expressly told Lincoln the lowered marks were as a result of her speech.  *See id*. at 2-3.  Thus, that this action was in retaliation for her speech is absolutely clear.  Moreover, this statement was made at school by an administrator with direct control over Lincoln.  Thus, worries about opening the floodgates for legitimate cases resulting from cockeyed looks from third parties in the local coffee shop seem to the Court to be overblown.  This distinction between this case and that proposed by the District is clear to the Court and should be clear to any other observer who might take a closer look, litigant and court alike.

      Perhaps if her lower evaluation were the sole basis for Lincoln's claims, the Court would be inclined to agree with the District's position. Importantly, however, they are not. Given Runion's alleged statement after Lincoln questioned her about the marks, the Court does not believe that these lowered marks, when combined with the threats against her husband, cannot be said to have the potential to chill Lincoln's speech. Though these actions may not seem like much, this Court, like the Court in *Bart*, believes that whether the combined effect of these actions reaches the threshold

of actionability under § 1983 is a question of fact.

As the Court has determined that Lincoln has pleaded a claim of First Amendment retaliation sufficiently, the Court need not address at this juncture whether the standards for stating a claim under the Illinois Constitution are less rigorous.

## CONCLUSION

The District's motion to dismiss (Doc. 24) is **DENIED**.

**IT IS SO ORDERED.**

**DATED: March 29, 2006.**

                                                      /s/ J. Phil Gilbert
                                                      **J. PHIL GILBERT**
                                                      **U.S. District Judge**